**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **ASHLEY DIAMOND,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:21-cv-378 (MTT)** |
| | ) | |
| **ARNEIKA SMITH,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff Ashley Diamond claims Defendant Arneika Smith sexually assaulted her while she was incarcerated at the Georgia Diagnostic and Classification Prison ("GDCP") in violation of the Eighth and Fourteenth Amendments. Doc. 36. Smith—who at the time of the alleged assault was a correctional officer with the Georgia Department of Corrections ("GDC")—now moves for summary judgment on qualified immunity grounds. Doc. 126. For the following reasons, that motion (Doc. 126) is **GRANTED**.

## I. BACKGROUND

While incarcerated at GDCP, Diamond was an inmate-orderly assigned to C-house. Docs. 126-2 ¶¶ 4-5; 133-5 at 3 ¶¶ 4-5. Smith worked as a correctional officer in the same facility. *Id.* As an orderly, Diamond was supervised by Smith, with Diamond's orderly status giving her special privileges to do things other inmates could not, including "whatever" the dorm officer "need[ed]." Doc. 128 at 97:15-98:10, 120:17-121:6.

On the morning of May 9, 2020, Smith asked Diamond to accompany her to the "officer's office." Docs. 126-2 ¶ 6; 133-5 at 3 ¶ 6. The "officer's office" was the same size as an inmate's cell and contained a toilet, sink, shelves, chair, table, and other miscellaneous items. Docs. 126-2 ¶ 7; 133-5 at 3 ¶ 7. It is undisputed Smith did not use physical force to make Diamond enter the room. Docs. 126-2 ¶ 6; 133-5 at 3 ¶ 6. However, Diamond argues she only accompanied Smith because Smith was a correctional officer with the ability and authority to discipline or otherwise punish Diamond. *Id.* Once inside the office, Smith locked the door and the parties remained in the room for approximately two hours. Docs. 126-2 ¶ 8; 133-5 at 3 ¶ 8. During that time, Smith asked Diamond questions about her genitalia and breasts. Docs. 126-2 ¶ 9; 133-5 at 3 ¶ 9. Smith then proceeded to touch Diamond's legs and thighs through her clothes. Docs. 126-2 ¶ 11; 133-5 at 3 ¶ 11. Smith never reached under Diamond's clothes, and no other inappropriate touching occurred during that encounter. *Id.*

The next day, a similar situation unfolded. Docs. 126-2 ¶ 12; 133-5 at 3 ¶ 12. The two remained together in the closet for at least two hours, save for a brief interruption by another correctional officer. *Id.* Following that interruption, Smith and Diamond returned to the office, where they remained for another 45 minutes to two hours. *Id.* At the request of Smith, Diamond briefly exposed her breasts and genitalia. Docs. 126-2 ¶ 13; 133-5 at 3 ¶ 13. Again, Diamond claims she only complied because she was coerced into doing so given Smith's position of authority. Doc. 133-5 at 3 ¶ 13. Smith similarly exposed herself, and briefly showed Diamond her breasts without removing her bra or clothes. Docs. 126-2 ¶ 14; 133-5 at 3 ¶ 14. Smith also touched

Diamond's thighs, legs, and buttocks through Diamond's clothes.  Docs. 126-2 ¶ 15; 133-5 at 3 ¶ 15.

Following her encounters with Smith in the "officer's office," Diamond attempted suicide and engaged in other forms of self-harm.  Docs. 133-5 at 2 ¶ 7; 135 at 4.  As for Smith, she does not contest that prison rules and Georgia law prohibit correctional officers from touching inmates in a sexual manner, and that Smith was aware of those prohibitions at the time of her encounters with Diamond.  Docs. 133-5 at 1 ¶ 4; 135 at 3. Smith was subsequently fired, although she disputes that her termination was related to the conduct at issue in this case.  Docs. 133-5 at 2 ¶ 8; 135 at 4.

The majority of the substantive allegations in Diamond's complaint concerned the GDC's classification and assignment decisions regarding transgender inmates and Diamond's continuing incarceration at Coastal State Prison.  *See* Doc. 36.  The only allegations that involved Arneika Smith concerned the two discrete encounters in the "officer's office" at GDCP.  *See id.* ¶¶ 95-114.  Accordingly, the Court severed Diamond's claims against Smith.  Doc. 114.

Diamond's operative complaint, as severed, alleges two constitutional claims for damages against Smith in her individual capacity under 42 U.S.C. § 1983.  Doc. 36 ¶¶ 295-313.  Diamond's first claim, contained in Count II of the amended complaint, alleges Smith's sexual abuse violated Diamond's Eighth Amendment right to be free from cruel and unusual punishment.  *Id.*  ¶¶ 295-304.  Diamond's second claim, contained in Count III of the amended complaint, alleges Smith violated Diamond's Fourteenth Amendment right to privacy by intruding on Diamond's "bodily integrity" and forcing the "disclosure of

certain personal matters." *Id.* ¶¶ 305-313.  Diamond seeks declaratory relief and nominal, compensatory, and punitive damages for both claims.  *Id.* ¶¶ 304, 313.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic … the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority."  *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).  "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should

not apply." *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).

## A. Smith was Acting Within her Discretionary Authority

"To establish that the challenged actions were within the scope of [her] discretionary authority, [Smith] must show that those actions were (1) undertaken pursuant to the performance of [her] duties, and (2) within the scope of [her] authority." *Est. of Cummings*, 906 F.3d at 940 (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). "In applying each prong of this test, [the Court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)).

It is rarely disputed that a defendant acted within her discretionary authority, and Smith reasonably assumed that issue was undisputed here. *See* Doc. 126-1 at 7. But Diamond, citing *Est. of Cummings v. Davenport*, argues that Smith somehow left the broad bounds of her discretionary authority as a correctional officer when she sexually assaulted her. Doc. 133 at 7-11. In *Est. of Cummings*, the Eleventh Circuit held that a prison warden acted outside of his discretionary authority when he instructed a hospital to enter a do-not-resuscitate order for an inmate and to subsequently withdraw his artificial life support. 906 F.3d at 941. There, a severely injured inmate was airlifted from the prison to the University of Alabama at Birmingham Hospital. *Id.* at 937. Over the protests of the inmate's mother and other family members, the hospital relied on the

warden's authorization "to stop giving [the inmate] medication and to disconnect the life support machine." *Id.* at 938.  The hospital reasoned that because the State had legal custody over her son, the decision to let him die was that of the warden and not the inmate's mother.  *Id.*  The inmate was removed from life support and died shortly thereafter.  *Id.*

The district court held the warden "had not met his burden of establishing that the alleged acts were within his discretionary authority," and the Eleventh Circuit agreed. *Id.* at 939, 943.  Because the Alabama Natural Death Act specifies who may make end-of-life decisions on behalf of a permanently incapacitated patient, and a prison warden was nowhere on that list, the Eleventh Circuit reasoned the warden categorically lacked the authority to take such action.  *Id.* at 942.  Thus, the warden was not entitled to raise the shield of qualified immunity.  *Id.*

Putting aside the unusual circumstances of *Est. of Cummings*, it is exceedingly rare for an official to be acting outside the scope of their discretionary authority and thus be precluded from claiming qualified immunity as a matter of law.  *See, e.g.*, *Spencer v. Benison*, 5 F.4th 1222, 1232 (11th Cir. 2021); *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019); *Ross v. James*, 861 F. App'x 770, 778 (11th Cir. 2021).  Nonetheless, Diamond contends this case presents such an unusual circumstance because both GDC policy and Georgia law prohibit sexual abuse.  Doc. 133 at 8-11.  But the question is not whether it was within Smith's authority to commit an allegedly illegal act.  *Mikko*, 857 F.3d at 1144.  Framing the inquiry in that manner conflates the distinct questions of whether Smith acted lawfully with the question of whether she acted within the scope of her discretion.  *Sims v. Metro. Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992).

In other words, Smith must only demonstrate "objective circumstances which would compel the conclusion that [her] actions were undertaken pursuant to the performance of [her] duties and within the scope of [her] authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (citations omitted). For example, in *Spencer*, which distinguished *Est. of Cummings*, the appropriate question was not whether a sheriff acted within his job duties and authority when he ordered a landowner to remove private property from his land, because framed in that manner, the inquiry "failed to strip out the allegedly illegal conduct—ordering the removal of a private landowner's property." 5 F.4th at 1231. Rather, the properly framed question was whether a sheriff acted within his job duties and authority when he ordered a landowner to remove private property from his land *to achieve public safety*, and the answer was clearly yes. *Id.* at 1231-32. Similarly, the question in this case is not whether Smith had the authority to order Diamond into the "officer's office" to sexually abuse her, but whether Smith could control and interact with inmate-orderlies in a general sense.

Clearly, Smith, a correctional officer, could order Diamond, an orderly, to perform certain jobs in C-House. *See* Docs. 126-2 ¶¶ 4-5; 133-5 at 3 ¶¶ 4-5. And even if, as Diamond contends, directing inmates into the "officer's office" was against prison policy, that fact is not dispositive.[1] *Gaillard v. Commins*, 562 F. App'x 870, 873 (11th Cir. 2014) ("an officer may act within his discretionary function even when he is off-duty or when his conduct possibly violates a department policy."). In any event, Diamond admits that

---

[1] Neither is the fact that Georgia law prohibits sexual battery and "sexually explicit conduct" between correctional officers and inmates. O.C.G.A. §§ 16-6-5.1; 16-6-22.1. Battery is a crime under Georgia law. O.C.G.A. § 16-5-23. If an officer beats a prisoner, the officer has violated Georgia law. That, however, does not mean the officer was not acting within the scope of his discretionary authority. If it did, qualified immunity would not be a defense to Eighth Amendment excessive force claims.

-8-

Smith, as her supervisor, could order Diamond to perform tasks.  Doc. 128 at 97:15-98:10, 120:17-121:6.  And while inmates were generally not allowed in the "officer's office," supervisors could, depending on the circumstances, order an inmate to perform a task in the office.  Doc. 137 at 43:13-44:1, 68:6-19.  Of course, that is just what Smith did.  Although Smith's order was a ruse to facilitate her assault, Smith was still acting well within the scope of her discretionary authority.

In short, Smith had discretionary authority to interact with Diamond, and it was within the context of that interaction that the alleged constitutional violations occurred.  This is not to condone sexual assault or abuse.  However, these alleged acts are more properly considered in the core qualified immunity analysis where the court examines the actual conduct of Smith to see if the specific situation is governed by clearly established law.  Smith successfully established that she acted within the scope of her discretionary authority, and thus, is entitled to claim qualified immunity.

**B. Smith is Entitled to Qualified Immunity**

To overcome a qualified immunity defense, Diamond must establish that (1) the facts, viewed in her favor, establish a constitutional violation; and (2) the unconstitutionality of Smith's conduct was clearly established at the time the sexual assault occurred.  *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The episodes of harassment and touching alleged by Diamond are despicable and, for the purposes of this motion, are accepted as true.  But Diamond has not demonstrated that Smith's conduct was an intrusion on a "clearly established" right.

A right becomes "clearly established" in three ways.  *Mercado v. City of Orlando* 407 F.3d 1152, 59 (11th Cir. 2005).  First, Diamond can show that a materially similar case has already been decided, consisting of binding precedent by the Supreme Court, the Eleventh Circuit, or the highest court of the pertinent state.  *Id.*  Second, Diamond can show that a broader clearly established principle should control the novel facts of the particular case—that is, the unconstitutionality of the instant conduct must be apparent by looking to the guiding principles of the previous case, irrespective of the underlying factual situation.  *Id.*  Third, Diamond can show that the conduct is so egregiously unconstitutional that prior case law is unnecessary.  *Id.*  The second and third methods are rarely successful—"[t]he nonexistence of a decision specifically addressing the alleged right is a significant consideration in determining whether the right is clearly established."  *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (citing *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987)).

*1. Smith's Eighth Amendment Violation is Not Clearly Established*

Diamond's argument that Smith's conduct violated her "clearly established" Eighth Amendment right is brief and conclusory.  Doc. 133 at 14-15.  Diamond seems to suggest that *Sconiers v. Lockhart*, 946 F.3d 1256 (11th Cir. 2020), which partially overruled *Boxer X v. Harris*, 437 F.3d 1107 (11th Cir. 2006), provided Smith with "fair warning that sexual conduct of any kind … is a violation of the Eighth Amendment."  Doc. 133 at 14.  In *Boxer X*, the Eleventh Circuit first recognized that "severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment."  437 F.3d at 1111.  To prevail on such a claim, the prison official must have a "sufficiently culpable state of mind" and the injury must be "objectively,

-10-

sufficiently serious."  *Id.* (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)).  The Eleventh Circuit thus held that while sexual abuse of an inmate may violate the Eighth Amendment, no such violation occurred when a prison guard solicited an inmate to masturbate on threat of reprisal because the inmate did not suffer more than *de minimis* injury—which under Eleventh Circuit precedent was insufficient to satisfy the objective component of the inquiry.  *Id.* (citing *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002)).

The Eleventh Circuit revisited *Boxer X* in *Sconiers*, 946 F.3d at 1266-68.  The facts of *Sconiers* are grotesque: while shackled by hand restraints, leg irons, and wrist restraints, the inmate was pepper-sprayed, slapped in the face, and slammed to the ground by a correctional officer.  *Id.* at 1260.  Once on the ground, the officer pulled the inmate's pants down and forcefully penetrated the inmate's unclothed anus with his finger.  *Id.* at 1260-61.  Under those facts, and with the benefit of intervening Supreme Court precedent, the Eleventh Circuit held "[t]he lack of serious physical injury, considered in a vacuum, cannot snuff out Eighth Amendment sexual-assault claims," and to the extent *Boxer X* held otherwise, that portion of the case was abrogated.  *Id.* at 1267 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010); *Boxer X*, 437 F.3d at 1111).  Thus, the Eleventh Circuit reasoned that if the inmate could "prove to a reasonable jury's satisfaction" that the correctional officer "sadistically and maliciously forced his finger into [the inmate's] anus, [the officer's] actions violate the Eighth Amendment because they constitute severe sexual abuse of a prisoner."  *Id.*

Diamond argues *Sconiers*—which was decided five months before the conduct at issue here—abrogated a "long line of legal precedent" and as such, the principles of

*Sconiers* were sufficient to put Smith on notice of the unconstitutionality of her conduct. Doc. 133 at 14 (citing 946 F.3d at 1267). To the contrary, *Sconiers* expressly confirmed "*Boxer X*'s holding that 'severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment,' remains good law." 946 F.3d at 1267 (citing *Boxer X*, 437 F.3d at 1111). In other words, *Sconiers* only abrogated existing precedent to the extent the lack of a serious injury is no longer fatal to an Eighth Amendment claim when an inmate alleges she is sexually abused by a correctional officer. That abuse, however, must still be "severe or repetitive" to constitute a violation of the Eighth Amendment. *Boxer X*, 437 F.3d at 1111.

In short, every sexual assault is not a constitutional violation, and whether an assault violates the Constitution depends on where the facts of the assault fall on a continuum. It is debatable whether Smith's abuse rises to the level of a constitutional violation. But if it did, *Sconiers* is still insufficient to place Smith on notice that her abuse of Diamond violated the Eighth Amendment. Unlike the correctional officer in *Sconiers*, Smith never used physical force, never reached under Diamond's clothes, and no penetration occurred. Docs. 126-2 ¶¶ 6, 11, 13, 15; 133-5 at 3 ¶¶ 6, 11, 13, 15. And as the Eleventh Circuit recognized in *DeJesus v. Lewis*, decided after the sexual assaults at issue here, "[t]he question left open by *Sconiers* is what type of conduct qualifies as a sexual assault." [2] 14 F.4th 1182, 1196 (11th Cir. 2021). Because that question was left

---

[2] In *DeJesus*, the Eleventh Circuit began to answer that question and held that "the 'sexual assault' of a prisoner by a prison official in violation of the Eighth Amendment occurs when the prison official, acting under color of law and without legitimate penological justification, engages in a sexual act with the prisoner, and that act was for the official's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner." *Id.* But even if *DeJesus* were available to Diamond, the types of sexual acts described there as potentially violative of the Eighth Amendment, which at a minimum include "intentional sexualized touching underneath clothing, such as fondling or penetration; coerced sexual activity; combinations of ongoing harassment and abuse; and exchanges of sexual activity for special treatment or to avoid discipline," are more egregious than the facts of Smith's assaults. *Id.* In fact,

open, it cannot be said that the much different, and more egregious, facts of *Sconiers* were sufficient to place Smith on notice of the unconstitutionality of her conduct.

Diamond's reliance on *Hope v. Pelzer* is similarly misplaced.  Doc. 133 at 15 (citing 536 U.S. 730, 741 (2002)).  In *Hope*, prison guards twice handcuffed a prisoner to a hitching post as a sanction for disruptive conduct while working in a chain gang. 536 U.S. at 733-34.  On the second occasion, the prisoner was stripped shirtless, and handcuffed to the hitching post for seven hours "while the sun burned his skin."  *Id.* at 734-35.  During that seven-hour period, guards taunted the prisoner about his thirst, only provided water once or twice, and never provided the prisoner an opportunity to use the bathroom.  *Id.* at 735.  The Supreme Court held that, because the prison guard's behavior was so patently unconstitutional, no "materially similar" case law was required for the constitutional violation to be clearly established.  *Id.* at 745-46.  *Hope* is the rare exception—while Smith's actions are despicable, they are not so egregiously unconstitutional as to fall within the purview of *Hope*.

Diamond's real argument seems to be a practical one—all correctional officers know without a doubt that sexual contact with inmates is a serious criminal offense and they don't need a court decision to spell that out for them.  As a practical matter, that is likely true.  But, for better or worse, that is not how qualified immunity analysis works. Whatever could be said about the judge-made doctrine of qualified immunity, no one would call it practical.

---

*DeJesus* specifically notes that while "[s]ome clothed sexualized touching may also qualify as 'sexual assault' … those types of allegations will need to be viewed on a case-by-case basis to evaluate whether they allege a 'sexual assault' in violation of the Eighth Amendment."  *Id.* n.12.  So even if *DeJesus* were available to Diamond, it would be a stretch to read *DeJesus* to provide clear notice that Smith's conduct violated the Eighth Amendment.

For the reasons stated, Smith is entitled to qualified immunity on Diamond's Eighth Amendment Claim.

*2. Smith's Fourteenth Amendment Violation is Not Clearly Established*

The Eleventh Circuit has recognized that inmates "retain certain fundamental rights of privacy," including a "constitutional right to bodily privacy." *Fortner*, 983 F.2d at 1029-30.  In *Fortner,* female officers assigned to duties in the living quarters of male inmates, "solicit[ed] ... [male prisoners] to masturbate and otherwise exhibit their genitals for the female officers' viewing." *Id.* at 1027.  "[B]ecause most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating,'" the Eleventh Circuit recognized a violation of that narrow right could be violative of the Fourteenth Amendment. *Id.* at 1030 (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).  In *Boxer X*, the Eleventh Circuit similarly held that when a female prison guard repeatedly solicited a male inmate—over a period of six months—to "strip naked and perform sexual acts of self-gratification," for her enjoyment, such conduct "is clearly within the scope of the right established in *Fortner*." 437 F.3d at 1109-11.  Nonetheless, *Boxer X* cautioned that such determinations must be made "on a case-by-case basis." *Id.* at 1111 (citing *Fortner*, 983 F.2d at 1030).

Diamond contends both *Boxer X* and *Fortner* are sufficient to place Smith on notice of the unconstitutionality of her conduct.  Doc. 133 at 15-17.  But both cases involved factual scenarios far more egregious than that presented in this case.  Docs. 126-1 at 11-12; 134 at 8.  Most significantly, Diamond was not compelled to engage in acts of self-gratification, and the encounters in the "officer's office" were both private

and brief compared to the prolonged public displays in *Boxer X* and *Fortner*.  Smith's interaction with Diamond on May 9, 2020, involved no nudity whatsoever, and was limited to questions about her breasts and genitalia.  Docs. 126-2 ¶¶ 9,11; 133-5 at 3 ¶¶ 9, 11.  As to the May 10 encounter, Diamond only briefly exposed her breasts and genitalia.  Docs. 126-2 ¶ 13; 133-5 at 3 ¶ 13.  Neither *Boxer X* nor *Fortner* are sufficient to place Smith on notice that an isolated instance of compelled nudity is sufficient to constitute a violation of Diamond's Fourteenth Amendment right to bodily privacy.

## IV. CONCLUSION

Even if Smith's conduct was violative of the Eighth and Fourteenth Amendment, the unconstitutionality of Smith's conduct was not "clearly established" at the time the conduct occurred.  Accordingly, Smith's motion for summary judgment on qualified immunity grounds (Doc. 126) is **GRANTED**.

**SO ORDERED**, this 7th day of September, 2022.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT